UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|   |   |   |
|---|---|---|
| | : | |
| JOSEPH C. MONROE, JR., | : | |
| Plaintiff, | : | |
| | : | |
| VS. | : | NO. 3:09-CV-02132 (DJS) |
| | : | |
| CITY OF DANBURY, | : | |
| Defendant. | : | |

MEMORANDUM OF DECISION AND ORDER

The plaintiff, Joseph C. Monroe, Jr. ("Monroe"), brings this action against the defendant, the City of Danbury ("the City"), alleging employment-related discrimination based on his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* ("Title VII") and the Equal Protection Clause of the Fourteenth Amendment.[1] The defendant now moves for summary judgment pursuant to Fed. R. Civ. P. 56.  For the following reasons, the defendant's motion for summary judgment (Doc. # 17) is GRANTED.

I.   FACTS

Construed in the light most favorable to the plaintiff, the non-moving party, the facts are as follows:

In September 1988 the plaintiff, an African American male, was hired by the City as a police officer in the Danbury Police Department ("DPD"). On September 12, 2001, the plaintiff

---

[1]The Complaint also included a claim of  deprivation of a contractual right in violation of 42 U.S.C § 1981. The defendant addressed this claim in its motion for summary judgment, but the plaintiff failed to address it in his opposition to that motion. Consequently, the Court deems that claim abandoned. See Ferraresso v. Town of Granby, 646 F. Supp. 2d 296, 305 (D. Conn. 2009) (internal quotation marks omitted) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

was promoted to the rank of Detective. The DPD's Detective Bureau is made up of four divisions: the Special Investigations Division ("SID"), which investigates drug, prostitution, and vice crimes; the White Collar Division, which investigates white collar crimes; the Youth Bureau, which investigates youth related crimes; and the General Investigation Division ("GID"), which investigates all other major crimes. Prior to the time he transferred into the GID, Monroe worked for seven years in the Tactical Narcotics Unit. During this period he received narcotics-related training in a number of areas and frequently interacted with the SID.

Sergeant Adam Fernand is the plaintiff's direct supervisor in the GID. Captain Mitch Weston oversees the Detective Bureau as a whole, with Lieutenant Thomas Michael supervising the entire GID and Lieutenant James Fisher supervising the SID.  Alan Baker is the Chief of Police and the highest ranking official in the DPD.

On February 26, 2009, an opening in the SID was posted. This position was "open only to Detective Police Officers." (Doc. # 18-7, at 1). There is debate as to when the opening was first announced. The plaintiff claims that the position was first announced in 2006 but remained unfilled and was posted again in February 2009. The defendant contends that the DPD decided to create the opening in the SID in February  2009, specifically to reduce the overtime hours of the SID detectives.

The requirements listed on the SID position posting included   proven ability to be self-motivated, able and agreeable to work a flexible schedule, proven investigative abilities, ability to investigate incidents involving narcotics, gambling and vice, proven ability to accept responsibility, exceptional communication skills, ability to properly interact with all members of

the DPD, and proven tactical training and experience. Seven [2] detectives applied for the SID opening by the closing date of March 9, 2009. Detective Joseph LaRose (Caucasian male) applied on March 5, 2009. Detectives James Lalli (Caucasian male), Ethan Mable (Caucasian male), and Vincent Daniello (Caucasian male) applied on March 6, 2009. Monroe and Detective Rachel Halas (Caucasian female) applied on March 9, 2009.

On March 11, 2009, Captain Weston informed all the candidates by email that interviews would be held on March 12 2009, before a panel consisting of Captain Weston, Lieutenant Fisher, and Lieutenant Michael. Chief Baker had determined before the opening in the SID was posted "that anyone who applied for the assignment would be interviewed by a panel of three. . . ." (Doc. # 18-1, at 2, ¶ 7). According to Chief Baker, these individuals would best know the applicants' "dispositions, work ethics and personality," since they were the supervisory officials who worked with the applicants every day. (*Id.*).[3]

Chief Baker, along with Captain Weston, Lieutenant Fisher, and Lieutenant Michael, developed three questions to ask during the interviews: (1) Why do you want to be assigned to the Special Investigations Division?; (2) The Danbury Narcotics Unit is recognized as one of the best in the State. If you were selected as a new Detective in that unit, can you think of what you

---

[2] Only six detectives were considered for the position, because Detective Ehrhard withdrew his application before the oral interviews were conducted.

[3] Monroe was never told before he put in his application that there would be no interview process, but the SID position posting did not mention interviews. He alleges that there was no intent to do interviews before he put in his application, but does not support this with any admissible evidence. Rather, he asserts in a conclusory fashion that "someone was already set up for the job," i.e., "Detective Halas," and that he based that conclusion on "the rumor that started it all." (Doc. # 18-2, at 6:13, 16, 19). Monroe also submitted a posting concerning a different position which did include a reference to possible interviews. The fact that another job posting included a statement that "[t]he Chief of Police reserves the right to conduct individual interviews "; (doc. # 22-3, at 78); does not demonstrate that interviews were not intended in this case, particularly since the other job posting provided by the plaintiff was issued on January 12, 2010, which was nearly a year after the posting at issue in this case. With no admissible evidence to support the plaintiff, the court deems the defendant's facts in this regard admitted. *See* Fed. R. Civ. P. 56(e)(2) and (3); D. Conn. L. Civ. R. 56(a)1 and 3.

could do to continue to promote that image?; and (3) What characteristics or traits have you displayed over your law enforcement career which will be beneficial to your duties if assigned to the Special Investigations Division? The interviews were conducted on March 12, 2009, and all six of the applicants were asked these three same questions.

After Captain Weston, Lieutenant Fisher, and Lieutenant Michael conducted all six interviews, they ranked the candidates in order of one through six based on the interviews, the applicant's written applications, and discussion of the applicants as their supervisors. The panel recommended the applicants for the SID position to Chief Baker in the following order: (1) Detective Halas, (2) Detective Lalli, (3) Detective LaRose, (4) Detective Monroe, (5) Detective Mable, and (6) Detective Daniello.

In a memo to Chief Baker, Captain Weston stated that the panel felt that Detective Halas was the most qualified applicant for the SID position because her "work record reveals a background in drug and vice suppression, excellent investigative ability, the ability to relate to people of all backgrounds, and the obvious ability to be a team player." (Doc. # 18-9, at 1). On March 13, 2009, Chief Baker offered the SID position to Detective Halas. On March 15, 2009, Detective Halas telephoned Captain Weston to inform him that she could not accept the SID position. On March 16, 2009, Detective Halas memorialized her refusal of the SID position in a memorandum she sent to Chief Baker.

Also on March 16, 2009, Captain Weston sent an updated memo to Chief Baker recommending the five remaining applicants in the following order: (1) Detective Lalli, (2) Detective LaRose, (3) Detective Monroe, (4) Detective Mable, and (5) Detective Daniello. Captain Weston's memo stated that the panel felt that Detective Lalli was the next most qualified

-4-

candidate because his "background in investigative work and experience as an evidence technician, are seen as assets to SID. In addition, in the time that Det. Lalli has been assigned to the General Investigations Division, he has shown himself to be able to investigate complex investigations, work well with individuals of diverse background[s] and be an able team player." (Doc. # 18-12, at 1). Chief Baker offered the position to Detective Lalli and he accepted it. Chief Baker then informed the plaintiff and the other applicants of his decision to offer the SID position to Detective Lalli.

A transfer into the SID position would have been a lateral transfer for Monroe. If he had been given the SID position in March 2009, his base salary would have been the same as his base salary in the GID. While all DPD Detectives have the same job description, GID detectives work fixed hours, while SID detectives have flexible hours which they can set themselves. Monroe contends that the flexibility of hours afforded to SID detectives enables them to pick up more overtime hours and have more job opportunities, both of which provide an opportunity for increased income.[4]  Monroe also claims that the SID position is more prestigious than working in the GID, because the SID works on high-profile drug cases and works with other agencies, like the FBI and the DEA. Being a detective in the SID is more desirable, according to Monroe, because of the nature of the work (narcotics), the flexible hours, and the ability to wear "soft clothes," i.e., "jeans, shorts, sneakers, whatever you want." (Doc. # 22-3, at 24:12-15).

According to Monroe, he was the best candidate for the SID position because of the "tremendous amount of training and a lot of experience " he had in the area of narcotics. (Doc. #

---

[4] This contention is supported only by the plaintiff's conclusory deposition testimony that it was "common knowledge that [SID detectives] make more overtime than anyone in General unless there's a homicide." (Doc. # 22-3, at 26:18-19). He also testified, however, that it "could be " the case that SID detectives get a significant amount of overtime hours "once in a blue moon." (*Id.* at 26:10-12).

18-2, at 15:17-18). This included being a member of the DPD for over twenty years, temporarily being assigned to SID in an undercover capacity for a narcotics purchase leading to an arrest, being a member of the Tactical Narcotics Team for over seven years, and his training in Narcotics Identification and Investigation, Advanced Drug Law Enforcement, Undercover Drug Enforcement Techniques, Interview & Interrogation for Narcotics Investigations, and Basic Drug Investigation. Monroe was never told by his supervisors or a decision-maker that he was the most qualified of the candidates for the SID position. Monroe has never seen the training records of Detectives Halas, Lalli, LaRose, Mable, or Daniello, but he has seen their applications for the SID position that was awarded to Detective Lalli in 2009.

Decisions regarding assignments within any of the divisions of the DPD Detective Bureau are not subject to a collective bargaining agreement. Chief Baker was the final policymaking official for matters regarding who is assigned to which division. His decision to appoint Detective Halas and then Detective Lalli to the SID position was not subject to review by anyone else.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a) . On a motion for summary judgment, the Court must therefore "determine whether, as to any material issue, a genuine factual dispute exists." Kaytor v. Electric Boat Corp., 609 F. 3d 537, 545 (2d Cir. 2010). The burden is on the moving party to establish that there are

no genuine issues of material fact in dispute in a motion for summary judgment. See CILP

Associates, L.P. v. Pricewaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013). The moving

party may satisfy that burden by "point[ing] to a lack of evidence to go to the trier of fact on an

essential element of the nonmovant's claim." Id.

 A fact is material if it "might affect the outcome of the suit under the governing law."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of material fact is genuine

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

To prove that there is a genuine dispute, the nonmoving party must go beyond the pleadings and

designate specific facts showing that there is a genuine issue for trial. Holcomb v. Iona College,

521 F.3d 130, 137 (2d Cir. 2008). If the nonmoving party fails to make a sufficient showing on

an essential element of its case with respect to which it has the burden of proof, then summary

judgment must be granted. Powell v. Donahoe, 519 F. App'x 21, 22 (2d Cir. 2013).

 In making these determinations, "the court must review the record taken as a whole."

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000) (internal quotation

marks omitted). In doing so, the court must "resolve all ambiguities and draw all permissible

factual inferences in favor of the party against whom summary judgment is sought." Holcomb,

521 F.3d at 137. "Only when reasonable minds could not differ as to the import of the evidence

is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

Nonetheless, "the mere existence of a scintilla of evidence in support of the plaintiff's position

will be insufficient," to defeat a motion for summary judgment. Lunts v. Rochester City School

District, 515 F. App'x 11, 13 (2d Cir. 2013) (internal quotation marks omitted). A court needs to

be cautious about granting summary judgment to an employer in a discrimination case, but

"[e]ven in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." Holcomb, 521 F.3d at 137. The party opposing summary judgment must provide specific facts that show that there is a genuine issue of material fact, not merely rely on allegations in the complaint, conclusory statements, or assertions that the moving party's affidavits are not credible. Watson v. Paulson, 578 F. Supp. 2d 554, 561 (S.D.N.Y. 2008).

### B. TITLE VII

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color . . . ." 42 U.S.C. § 2000e-2(a). In a Title VII employment discrimination case, when there is no direct evidence of discrimination, the McDonnell Douglas "burden-shifting" framework is applied. Barella v. Village of Freeport, 12-CV-0348 (ADS) (WDW), 2014 U.S. Dist. LEXIS 58827, at *26 (E.D.N.Y. April 26, 2014). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Holcomb, 521 F.3d at 138. Once a prima facie case is established, the burden shifts to the defendant to proffer a "legitimate, nondiscriminatory reason" for its action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Should the defendant meet its burden of production, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were instead a pretext for discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507-08 (1993).

For the reasons explained below, the Court finds that the plaintiff did not establish a

prima facie case of discrimination, and, even if he had, reasonable minds could not differ that the evidence on the issue of pretext was not persuasive.

1**. Prima Facie Case**

To establish a prima facie case of racial discrimination, the plaintiff must show that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he suffered a materially adverse employment action; and (4) the circumstances surrounding the adverse employment action give rise to an inference of discrimination. See Holcomb, 521 F.3d at 138. These four prongs must be supported by evidence, though the threshold for establishing a prima facie case is low. Id. at 139. Both parties agree that the plaintiff belonged to a protected class and qualified for the position of SID Detective. (Def. Doc. 18, pg. 8). The Court will proceed to consider the third prong of the test.

Materially Adverse Employment Action

An adverse employment action must be "a materially adverse change in the terms and conditions of employment." Mills v. Southern Connecticut State University, 519 F. App'x 73, 75 (2d Cir. 2013) (internal quotation marks omitted).  "To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  Sanders v. New York City Human Resources Administration, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks omitted). Examples of such changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id. (internal quotation marks omitted).

-9-

The denial of a transfer can be an adverse employment action, but only if a plaintiff has "proffer[ed] *objective indicia* of material disadvantage; subjective, personal disappointment[] is not enough." Beyer v. County of Nassau, 524 F.3d 160, 164 (2d Cir. 2008) (emphasis added) (internal quotation marks omitted); see also Hunt v. Rapides Healthcare System, LLC, 277 F.3d 757, 771 n.8 (5th Cir. 2001) ("the focus is on the objective qualities of the positions, rather than on an employee's subjective preference for one position over another. That subjective preference, alone, is an insufficient basis for finding an adverse employment action."). "[T]o show an adverse employment action by being denied a request for a transfer, a plaintiff must establish that [the employer's] denial of [his]request for a transfer created a materially significant disadvantage in [his] working conditions." Adams v. Festival Fun Parks, LLC, No. 13-1183-cv, 2014 U.S. App. LEXIS 5292, at *9 n.2 (2d Cir. March 21, 2014) (internal quotation marks omitted). To avoid summary judgment a plaintiff has to produce "sufficient evidence to permit a reasonable factfinder to conclude that the sought for position is materially more advantageous than the employee's current position, whether because of prestige, modernity, training opportunity, job security, or some other objective indicator of desirability." Beyer, 524 F.3d at 165. If a transfer is truly lateral, however, so that there are no significant changes in employment conditions, "the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action." Kessler v. Westchester County Department of Social Services, 461 F.3d 199, 207 (2d Cir. 2006) (internal quotation marks omitted).

At his deposition, Monroe agreed that a transfer from one DPD detective division to another would be "lateral." (Doc. # 18-2, at 4:16). If he had been given the SID position, he

would have had the same base salary and job description as he did in his GID position. Although Monroe agreed at his deposition that a transfer into SID would be lateral, he contends that the SID position was "materially and significantly more advantageous" than his position within the GID. (Doc. # 22, at 8). He specifically mentions flexible hours, increased income potential by virtue of more overtime hours and more job opportunities, and greater prestige as indicia of this "materially and significantly more advantageous" position. While prestige or the opportunity for greater income may constitute objective qualities that would be materially significant, the question remains whether the plaintiff has "proffer[ed] objective indicia of material disadvantage" with respect to those matters. Beyer, 524 F.3d at 164.

The Court is not persuaded that the ability to work flexible hours, in and of itself, is materially significant for purposes of establishing an adverse employment action. "Unfavorable hours do not constitute an adverse employment action for the purposes of Title VII." Antonmarchi v. Consolidated Edison Co. of N.Y., Inc., No. 03 Civ. 7735 (LTS) (KNF), 2008 U.S. Dist. LEXIS 75458, at *45 (S.D.N.Y. Sept. 29, 2008). In this regard the Court notes that Monroe acknowledged that both SID and GID detectives are "required to work 40 hours per week." (Doc. # 22-3, at 22:14-16). With regard to the contention that flexible hours provides an opportunity for increased income by virtue of more overtime hours and more job opportunities, the Court finds that Monroe has provided only conclusory statements and hearsay in support of his claims. At his deposition, Monroe stated that it was "common knowledge that [SID detectives] make more overtime than anyone in General unless there's a homicide." (Doc. # 22-3, at 26:18-19). He also testified that it "could be" that SID detectives get a significant amount of overtime hours only "once in a blue moon." (Id. at 26:10-12). This testimony does not constitute

-11-

objective evidence of material disadvantage that could demonstrate that the denial of Monroe's transfer to SID constituted an adverse employment action.

Monroe further contends that the SID position is more prestigious than his GID position. A lateral transfer can be an adverse action based on prestige alone. Beyer, 524 F.3d at 162. However, in Beyer the plaintiff had clear, admissible proof of the lack of prestige in the plaintiff's current position, shown by her section languishing and the far greater opportunities for advanced training in and access to forensic science technologies in the other section. Id. This case is distinguished from Beyer, as the plaintiff supports this allegation only with conclusory deposition testimony:

> [T]here are times when other agencies would call you in to help them work a large case. I mean you're working with state, federal, and local agencies constantly. That's desirable. That's prestigious. They're asking, you're working with all kinds of agencies, FBI, DEA.[5]

(Doc. # 18-2, at 15:5-10). See Novak v. Waterfront Commission of New York Harbor, 928 F. Sup. 2d 723, 731 (S.D.N.Y. 2013) ("That [the plaintiff] was assigned work she deemed 'unfavorable' (office duty) and was removed from a project she apparently favored (assisting detectives on an FBI matter) does not mean she was subjected to a material adverse action."). The facts before the Court are also distinguishable from those in Abrams v. Department of Public Safety, 856 F. Supp. 2d 402, 409 (D. Conn. 2012), *affirmed in part, vacated in part*, Docket No. 13-111-cv, 2014 WL 3397609 (2d Cir. July 14 2014), where the court found that, "Plaintiff has indeed presented some evidence that assignment to the Van[6] carries prestige. Therefore, under

---

[5]Unlike the plaintiff in Beyer, Monroe presented no evidence of the lack of prestige in his current position.

[6]"The Van is a specialized unit comprised of five to six . . . detectives who investigate serious crimes, suspicious deaths, and homicides." Abrams, 2014 WL 33976099, at *1.

Beyer, denial of assignment to the Van could be an adverse employment action." See Abrams, 2014 WL 3397609, at *1 ("Van detectives have the same pay and benefits as other detectives and no change in title, but assignment to the Van is considered an elite position occupied by the 'best of the best troopers.'" (quoting from the deposition testimony of a detective other than the plaintiff))[7].

The Court does not doubt that Monroe has a personal preference for a position in SID. His subjective preference does not, however, constitute objective evidence of material disadvantage resulting from the denial of his transfer request and does not provide a basis for finding an adverse employment action under Title VII. Because Monroe has not shown that he suffered a materially adverse employment action, he has failed to establish a prima facie case of discrimination.

2. **Legitimate Nondiscriminatory Reason**

Even if Monroe had established a prima facie case of discrimination[8], the defendant offers a legitimate, nondiscriminatory reason for offering the SID position first to Detective Halas and then to Detective Lalli.

If a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to proffer a "legitimate, nondiscriminatory reason," for its actions. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). This is only a burden of production, not persuasion, so the defendant does not have to "persuade the court that the proffered reason

---

[7]The defendants in Abrams conceded on appeal that "denial to the Van was an adverse employment action, and thus that Abrams has met his prima facie case." Abrams, 2014 WL 3397609, at *5.
[8]As to the fourth prong of the prima facie case, inference of discrimination, Monroe has supplied evidence that he was similarly situated to an employee outside the protected class who was treated more favorably, even though Monroe was at least equally qualified and had more seniority. This in turn supports an inference of discrimination. See Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) .

was the actual reason for its decision." <u>Tarshis v. Riese Organization</u>, 211 F.3d 30, 36 (2d Cir. 2000). Despite <u>McDonnell Douglas'</u>s burden-shifting framework, the ultimate burden of persuasion stays with the plaintiff at all times. <u>Burdine</u>, 450 U.S. at 253. The defendant, on summary judgment, need only produce evidence that would allow for the conclusion that there was a nondiscriminatory reason for the action taken. In general, to meet this burden, the defendant must introduce admissible evidence that clearly sets forth the reasons for the plaintiff's rejection. <u>Burdine</u>, 450 U.S. at 255. The reasons must be "clear and reasonably specific." <u>Id.</u> at 258.

A jury could find that the defendant offered a legitimate, nondiscriminatory reason for not offering the SID position to the plaintiff. In their memo to Chief Baker recommending that the SID position be offered to Detective Halas, the panel stated that they felt Detective Halas was the most qualified candidate for the position because of her  "background in drug and vice suppression, excellent investigative ability, the ability to relate to people of all backgrounds, and the obvious ability to be a team player." (Doc. # 18-9, at 1). After Detective Halas indicated that she could not accept the SID position, the panel sent another memo to Chief Baker, recommending Detective Lalli on the basis of his "background in investigative work and experience as an evidence technician," as well as his demonstrated ability "to be able to investigate complex investigations, work well with individuals of diverse background[s] and be an able team player." (Doc. # 18-12, at 1). Evidence that the offers of the SID position were made on the basis of race-neutral grounds is sufficient to satisfy the defendant's burden of production. <u>See</u> <u>Holcomb</u>, 521 F.3d at 141 (the defendant satisfied its burden of production under <u>McDonnell Douglas</u> on the basis of evidence that decision makers "reached the decision on race-

neutral grounds ").  The Court stresses that "the determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993).

### 3. Pretext

Once the defendant satisfies its burden of production, the presumption of discrimination created by the prima facie case drops out of the case. Burdine, 450 U.S. at 255. The plaintiff then has the opportunity to show by admissible evidence that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination. See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005). "The plaintiff must produce . . . sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks omitted).  "[I]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000) (internal quotation marks omitted).

In some cases "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 148. In a case where a plaintiff opposes a motion for summary judgment on the basis of a claimed discrepancy in qualifications ignored by the employer, however, "that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served

-15-

to mask unlawful discrimination." <u>Byrnie v. Town of Cromwell Board of Education</u>, 243 F.3d 93, 103 (2d Cir. 2001). "In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." <u>Id.</u> (internal quotation marks omitted). This requirement is consistent with the view that  "[the court's] role is to prevent unlawful hiring practices, not to act as a super personnel department that second-guesses employers' business judgments." <u>Yu v. New York City Housing Development Corp.</u>, 494 F. App'x 122, 125 (2d Cir. 2012) (internal quotation marks omitted).

The record evidence before the Court pertinent to a consideration of pretext consists entirely of Monroe's qualifications versus the applications for the SID position submitted by Detectives Halas and Lalli. Consequently, the Court must consider the issue of pretext on the basis of Monroe's claim that he "was not offered the position although he was the most qualified candidate." (Doc. # 22, at 2)[9].

Monroe contends that he was the best candidate for the SID position because he had been a member of the DPD for over twenty years and had a "tremendous amount of training and a lot of experience "  in the area of narcotics. (Doc. # 18-2, at 15:17-18). The Court accepts the fact that Monroe had more experience than either of the other two detectives who were offered the SID position. The posted notice for the SID position indicated, however, that in addition to the

---

[9]Monroe's brief in opposition to the defendant's motion for summary judgment refers to certain "facts" as to which he has not provided any admissible evidence, i.e., an assertion that DPD has only five African-Americans on the force out of a total of 155 full time officers, and an AllBusiness article entitled *Hiring of African-Americans lags in Danbury police, fire departments*. His brief also references three court decisions which likewise do not constitute "evidence . . . sufficient to support a reasonable inference that prohibited discrimination occurred." <u>James v. New York Racing Association</u>, 233 F.3d 149, 156 (2d Cir. 2000).

investigatory skills required for the rank of Detective, an applicant for the position of SID

Detective must also have certain specified skills and abilities:

- • Proven ability to be self-motivated and innovative
- • Able and agreeable to work a flexible schedule
- • Proven investigative abilities
- • Ability to investigate incidents involving narcotics, gambling and vice
- • Proven ability to accept responsibility, take and follow orders and properly interact with all ranks and members of the Department
- • Exceptional communication skills
- • Proven tactical training and experience

(Doc. # 18-7, at 1).

Monroe acknowledges that he has never seen the training records of either Detective

Halas or Detective Lalli. His argument that he was the most qualified candidate relies, instead, on

the applications submitted by those two detectives for the SID position.  Having reviewed these

applications, the Court cannot conclude that Monroe's "credentials . . . [were] so superior to the

credentials of the person[s] selected for the job that no reasonable person, in the exercise of

impartial judgment, could have chosen the candidate[s] selected over the plaintiff for the job in

question." Byrnie, 243 F.3d at 103 (internal quotation marks omitted).[10] By way of example, the

application of Detective Halas indicates that she was "twice nominated [by her supervisor] for

Officer of the Year," and  "ha[s] been asked by the members of SID to assist them on occasion

with cases they are working on. . . . I bring 8 years of serious investigatory experience to the

table, as well as excellent communications skills, the proven ability to work with other agencies,

strong character and ethics." (Doc. # 22-3, at 72). Detective Lalli's application states that he

---

[10]The Court notes that the selection process involved not just a review of the applications, but a panel interview of
the candidates as well.

"made numerous self initiated drug arrests [and] [a]s a result . . . was selected by merit to serve a short tour of duty in the Special Investigations Division . . . ." (Id. at 58)  He also indicates that he has "received many Letters of Appreciation and Commendation, Citations, a Medal of Meritorious Service, and the Chief's Achievement Award throughout my years of service." (Id.). During one five year period, he  "was . . .  responsible for compiling and supervising small groups of evidence technicians in the collection and preservation of evidence related to major cases . . .  [and] also initiated the use and design of the 'Major Case Book' utilized in the investigation and prosecution of major cases." (Id.)

This Court "must respect the employer's unfettered discretion to choose among qualified candidates."Byrnie, 243 F.3d at 103 (internal quotation marks omitted). Monroe failed to demonstrate a pretext for discrimination on the basis of his claim that he was the most qualified of the candidates for the SID position.


## III. EQUAL PROTECTION

Monroe also claims that the defendant's failure to award him the SID position deprived him of equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution as enforced through 42 U.S.C. §1983. "In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, [courts] borrow the burden-shifting framework of Title VII claims." Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998) (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 n.1 (1993)). The elements of an equal protection claim and a Title VII claim are  "generally the same . . . and the two must stand or fall together." Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004). Since Monroe failed to

satisfy his <u>McDonnell Douglas</u> burden with respect to his Title VII claim, he likewise failed to satisfy his <u>McDonnell Douglas</u>  burden with respect to his Equal Protection brought pursuant to § 1983. Thus the defendant is entitled to summary judgment as to that claim.

Even if Monroe had cleared the <u>McDonnell Douglas</u> hurdle, he would have been required to make an additional showing with regard to his Equal Protection claim brought pursuant to § 1983.  "[W]hen the defendant sued for discrimination under . . . § 1983 is a municipality . . . the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 226 (2d Cir. 2004).  "To allege the existence of an affirmative municipal policy, a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality." <u>Missel v. County of Monroe</u>, 351 F. App'x 543, 545 (2d Cir. 2009).

Monroe attempts to impose liability on the defendant on the theory that a constitutional violation took place pursuant to the act of a person with policymaking authority for the municipality, alleging in his Complaint that the DPD "act[ed] . . . through its highest policy-setting officials for police employment matters." (Doc. # 1, at 2). <u>See</u> <u>Anthony v. City of New York</u>, 339 F.3d 129, 139 (2d Cir. 2003 ) (internal quotation marks omitted) ("where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy"). The parties agree that "Chief Baker is the final policymaking official for matters regarding who is assigned to the various detective divisions, including the SID." (Doc. # 19, at 6, ¶ 42 and Doc. # 22-1, at 4, ¶ 42).

In addition to showing that a particular official possessed final policymaking authority in the area involved in the lawsuit, a plaintiff seeking to impose § 1983 liability on a municipality must also show that his injuries were caused by the decisions of that official as a policymaker. See Jeffes v. Barnes, 208 F.3d 49, 56 (2d Cir. 2000). "A plaintiff may prove the causation element by showing either that the official who is a final policymaker in the area directly committed or commanded the violation of the plaintiff's federal rights . . . or that while the policymaker himself engaged in facially lawful . . . action, he indirectly caused the misconduct of a subordinate municipal employee." Id. at 61 (internal quotation marks and citation omitted).

Monroe admits that he never informed Chief Baker about the alleged discrimination and never complained to him directly. Furthermore, the plaintiff offers no evidence and makes no claim that Chief Baker knew about or directly participated in discrimination. The memos from the interview panel recommending first Detective Halas and then Detective Lalli for the SID position identified those candidates as the "most qualified " for the position and articulated nondiscriminatory reasons for those conclusions. (Doc. # 18-9, at 1 and Doc. # 18-12, at 1). There simply is no evidence before the Court sufficient to support a claim that Chief Baker directly or indirectly committed or commanded the violation of Monroe's federal rights.

 "[A] municipal policymaker may be found to have caused subordinate officials' conduct by reason of the policymaker's acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." Jeffes, 208 F.3d at 61 (internal quotation marks omitted). A municipality would be liable under this theory if  "the relevant practice is so widespread as to have the force of law." Id. (internal quotation marks omitted). The plaintiff has presented no admissible evidence that would suffice to present a

triable issue as to the existence of a practice of racial discrimination "so widespread as to have the force of law." <u>Id</u>. Thus, the defendant is entitled to summary judgment as to the Equal Protection claim for the additional reason that Monroe failed to show that the challenged acts "were performed pursuant to a municipal policy or custom." <u>Patterson</u>, 375 F.3d at 226.

CONCLUSION

For the reasons stated above, the defendant's motion for summary judgment (**doc. # 17**) is **GRANTED**.  All claims against the defendant City of Danbury are dismissed and the clerk is directed to close this case.

**SO ORDERED** this    11th        day of August, 2014.

_____/s/ DJS_____
DOMINIC J. SQUATRITO
UNITED STATES DISTRICT JUDGE